Christopher J. Kayser, OSB #984244
cjkayser@lvklaw.com
John C. Rake, OSB #105808
jrake@lvklaw.com
LARKINS VACURA KAYSER LLP
121 SW Morrison St, Suite 700
Portland, Oregon 97204
Telephone: 503-222-4424

John W. Stephens, OSB #773583
stephens@eslerstephens.com
Michael J. Esler, OSB #710560
esler@eslerstephens.com
ESLER STEPHENS & BUCKLEY LLP
121 SW Morrison Street, Suite 700
Portland, Oregon 97204
Telephone: 503-223-1510

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| Anderson Revocable Trust; BONNIE BUCKLEY, trustee of the Bonnie K. Buckley IRA; CARL AND KIRBY DYESS, trustees of the Dyess Family Trust; PETER KOUBECK, an individual and trustee of Peter L. Koubeck IRA; MICHAEL PETERSON, trustee of the Michael T. Peterson IRA; and ED WILSON, an individual, | Case No. 3:20-cv-01194-AR<br><br>PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF PARTIAL SETTLEMENT |
| Plaintiffs, | |
| v. | |
| DAVIS WRIGHT TREMAINE LLP, a Washington limited liability partnership; ROSS MILES, an individual; MAUREEN WILE, an individual; and PACIFIC PREMIER BANK, a California chartered bank; and RIVERVIEW COMMUNITY BANK, a Washington chartered bank, | |
| Defendants. | |

**TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................................. 1

II. DISCUSSION ...................................................................................................... 3

    A.   The DWT settlement meets the standard for preliminary approval, and the Banks' objections to it are premature. ....................................................................... 3

    B.   This court has personal jurisdiction over the Banks and equitable power to enter a contribution bar order. ......................................................................................... 5

    C.   Any judgment against the non-settling defendants will be reduced dollar-for-dollar by any amounts the Class receives from the DWT settlement. ..................................... 9

        1.   Controlling state law provides that any amounts Class members receive will offset their claims against the Bank on a dollar-for-dollar basis. ......................... 10

        2.   A pro tanto contribution bar is consistent with the purpose and intent of the Oregon Securities Law to compensate victims of unlawful securities sales. ....... 15

        3.   The DWT settlement amount is fair under the circumstances. ............................ 18

        4.   A pro tanto contribution bar is fair under the circumstances of this case. ............ 18

            a.   Banks play a critical role in sustaining Ponzi-like schemes and prolonging the unlawful sales of securities. .................................................................. 19

            b.   The Banks played a crucial role in the sales of AEM securities well beyond the mere preparation and execution of documents. ....................................... 21

    III. CONCLUSION ................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Am. W. Sec., Inc.*,
  265 Or. 514 (1973) ................................................................................. 13, 17

*Adams v. Perkins & Co. P.C.*,
  No. 1110-12903 (Mult. Co. Cir. Ct. Nov. 24, 2014) ........................................ 13

*Adamson v. Lang*,
  236 Or. 511 (1964) ........................................................................... 8, 13, 23

*Ainslie v. First Interstate Bank*,
  148 Or. App. 162 (1997) ................................................................... 8, 23, 24

*Ainslie v. Spolyar*,
  144 Or. App. 134 (1996) ................................................................... 8, 13, 15

*Ameripride Services Inc. v. Texas Eastern Overseas Inc.*,
  782 F.3d 474 (9th Cir. 2015) ............................................................. 16, 17, 20

*Anderson v. Carden*,
  146 Or. App. 675 (1997) .......................................................................... 12

*Atl. Richfield Co. v. Am. Airlines, Inc.*,
  836 F. Supp. 763 (N.D. Okla. 1993) .......................................................... 19

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) ................................................................... 24

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ................................................................................. 9

*Ciuffitelli v. Deloitte & Touche LLP*,
  2019 WL 1441634 (D. Or. Mar. 19, 2019) ............................................... 10, 13

*Class Plaintiffs v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) .................................................................... 3

*Cox v. Holcomb Family LP*,
  No. 1308-12201 (Mult. Co. Cir. Ct. Dec. 15, 2015) ................................... 23, 24

*Everts v. Holtmann*,
  64 Or. App. 145 (1983) ........................................................................... 18

*Franklin v. Kaypro Corp.*,
  884 F.2d 1222 (9th Cir. 1989) ................................................................. 16

*Froeber v. Liberty Mutual Ins. Co.*,
  222 Or. App. 266 (2008) ............................................................................ 3

*Gattuccio v. Averill*,
  Consolidated Cases No. 1011-16582 and 1105-06352
  (Mult. Co. Cir. Ct. Aug. 16, 2013) ............................................................ 14

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ................................................................. 11

*In re Atl. Fin. Mgmt. Inc. Sec. Litig.*,
  718 F. Supp. 1012 (D. Mass. 1988) ................................................................. 12

*In re Cendant Corp. Sec. Litig.*,
  109 F. Supp. 2d 235 (D.N.J. 2000) ................................................................. 20

*In re Crazy Eddie Securities Litig.*,
  824 F. Supp. 320 (E.D.N.Y. 1993) ................................................................. 21

*In re Prudential Securities, Inc. L.P. Litig.*,
  1995 WL 798907 (S.D.N.Y. 1995) ................................................................. 21

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) ........................................................................................ 9

*Katz v. China Century Dragon Media, Inc.*,
  2013 WL 11237202 (C.D. Cal. Oct. 10, 2013) .............................................. 20

*Kirby v. Snow*,
  252 Or. 592 (1969) ......................................................................................... 15

*McDermott, Inc. v. AmClyde*,
  511 U.S. 202 (1994) ....................................................................................... 20

*Morin v. Trupin*,
  1993 WL 248802 (S.D.N.Y. June 29, 1993) ................................................. 12

*Nw. Airlines, Inc. v. Transp. Workers Union of Am.*,
  451 U.S. 77 (1981) ......................................................................................... 12

*Pommier et al. v. Deloitte & Touche et al.*,
  No. 16CV36439 (Mult. Co. Cir. Ct. Feb. 22, 2018) ..................................... 23

*Prince v. Brydon*,
  307 Or. 146 (1988) ......................................................................................... 13

*SEC v. Capital Consultants*,
  2002 WL 31470399 (D. Or. Mar. 8, 2002) .............................................. 13, 14

*Singer v. Olympia Brewing Co.*,
  878 F.2d 596 (2d Cir. 1989) .......................................................................... 15

*Spear v. Fenkell*,
  2014 WL 7745845 (E.D. Pa. Dec. 12, 2014) ................................................ 11

*Sperry & Hutchinson Co. v. Hudson et al.*,
  190 Or. 458 (1951) ......................................................................................... 17

*Starr v. Heckathorne*,
  270 Or. 238 (1974) ......................................................................................... 15

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ......................................................................... 11

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
  552 U.S. 148 (2008) ....................................................................................... 18

*Walker v. Life Ins. Co. of the Sw.*,
  953 F.3d 624 (9th Cir. 2020) ........................................................................... 4

*White v. ITC Corp.*,
    1986 WL 15447 (D. Or. 1986)...................................................................... 23

*Yardley v. Rucker Bros. Trucking, Inc.*,
    42 Or. App. 239 (1979)............................................................................... 11

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................... 18

**Statutes**

ORS 59.115........................................................................................................ 12, 18

**Rules**

Fed. R. Civ. P. 23 ...................................................................................................... 4
ORCP 4 J..................................................................................................................... 9

**Secondary Sources**

Ellen M. Ryan & Laura E. Simmons,
    *Securities Class Action Settlements, 2010 Review and Analysis* ............................................ 20

# I. INTRODUCTION

The Class representatives have moved for preliminary approval of a $4.5 million settlement with Davis Wright Tremaine ("DWT"). That settlement with only one of six defendants far exceeds typical recoveries in many similar Ponzi-like schemes. It represents 15% of the Class's total claimed damages, including interest, and 42% of their out-of-pocket losses of investment principal. It will provide Class members, many of whom are retirees with limited income-earning potential and pressing needs, with cash without having to wait for the conclusion of what could be multi-year litigation. Pacific Premier Bank ("Pacific Premier") and Riverview Bank ("Riverview") (collectively, the "Banks") object to approval of the settlement because, as with most partial settlements in multi-party class actions, it requires an injunction barring the Banks from pursuing a contribution action against DWT if (as is likely) the remaining defendants are found jointly and severally liable for the remaining amount of the Class's damages. That objection gets it wrong on several levels.

First, the Banks misunderstand the nature of the Class's motion for preliminary approval of the settlement. At this stage, the only decision the Court is required to make is an initial determination that the settlement is sufficiently fair to provide putative class members with notice of it. A contribution bar order will not be issued at this stage. While a contribution bar is required under the terms of the settlement, such orders are routinely granted. Indeed, the Banks do not cite a single case in which a contribution bar has been denied outright. Nonetheless, now that the Banks have raised the issue, the Class is not opposed to a resolving it at this stage.

Second, the Banks, while seeking substantive modification to the bar order and suggesting that any judgment credit should be fault-based, contend that this Court lacks personal jurisdiction to bar any future contribution claims they may have. Not only is that incorrect for all the reasons

set forth in the Class's Opposition to the Motion to Dismiss, but it further underscores why exercise of personal jurisdiction over the Banks is fair and reasonable in this case. If this Court lacked jurisdiction to bar contribution claims in the jurisdiction in which the injury occurred, it would make resolving complex multiparty securities cases difficult, if not impossible, and would result in piecemeal litigation involving the same facts and law in multiple jurisdictions.

Third, the Banks' objection is premised on a basic misunderstanding of the settlement agreement and contribution bar order contemplated. The Banks claim that the "proposed Bar Order does not provide for *any* method of judgment credit for the non-settling defendants." Def. Pacific Premier Bank's Opp. to Class Reps.' Mot. for Prelim. Approval of Proposed Settlement at 14 n.4, ECF No. 97 ("PPB Opp."); *see* Def. Riverview Bank's Opp. to Class Reps.' Motion for Prelim. Approval of Partial Settlement at 2, ECF No. 98 (joining in PPB Opp.). That is wrong. As Plaintiffs have made clear, the settlement provides for dollar-for-dollar reductions of claims against any non-settling party, including the Banks. Mot. for Prelim. Approval of Proposed Settlement at 8–9, ECF No. 89 ("Motion"). That is the same type of credit Oregon courts routinely provide when approving a pro tanto contribution claims bar in connection with settlements of Oregon Securities Law claims.

Fourth, the Banks contend that any judgment credit arising from the contribution bar order should be pro rata, i.e, "fault-based," apportioned between settling and non-settling defendants according to the degree of fault. But the joint and several liability imposed on participants and material aiders in sales of securities in violation of Oregon Securities Law (ORS 59.115) is not fault-based, and there is not a single Oregon case that supports the Banks' position. Rather, the Oregon Securities Law is intended to afford the greatest possible protection to the investing public

by ensuring victims of securities violations are fully compensated for their losses regardless of

who among the liable defendants is most at fault.

 The Banks provide no valid reason to deny the preliminary approval of the DWT

settlement. The settlement was entered into in good faith, provides a significant recovery for Class

members for their now-worthless investments in AEM Funds, and is consistent with Oregon law.

Accordingly, the Court should grant the Class's Motion.

## II. DISCUSSION

### A.  The DWT settlement meets the standard for preliminary approval, and the Banks' objections to it are premature.

 Preliminary approval of class action settlements under Fed. R. Civ. P. 23 is designed to

certify a settlement class so that notice can be provided to prospective class members, who can

then be heard. The critical inquiry is the fairness of the settlement to *class members*. Here, other

than a footnote identifying minor nits with the form of notice, which class representatives have

addressed,[1] the Banks do not object to class certification or identify prejudice to absent class

---

[1] Pacific Premier first requests that the proposed class notice be revised to state that "non-settling defendants (in addition to DWT) deny any wrongdoing." PPB Opp. at 7 n.3. Class Representatives have made that change to the amended notice. Suppl. Mot. for Prelim. Approval of Partial Settlement and Updated Notice Form at 3, ECF No. 101; Decl. of John C. Rake in Supp. of Class Reps.' Suppl. Mot. for Prelim. Approval of Partial Settlement and Updated Notice Form, Ex. A at 17, ECF No. 102-1. Pacific Premier then suggests Class representatives may have erred by excluding persons who executed promissory notes with American Eagle Mortgage Mexico 600, LLC from the class, while also requiring all class members to release claims they may have relating to that investment fund. This is not an error. The definition of the class has always excluded persons who executed promissory notes with American Eagle Mortgage Mexico 600, LLC. Def. DWT's Notice of Removal, Ex. A ¶¶ 4–5, ECF No. 1-1; SAC ¶ 6. A class release that is broad enough to cover claims that may not be covered by a class definition is expressly permitted by *Froeber v. Liberty Mutual Ins. Co.*, 222 Or. App. 266, 276 (2008) and the Ninth Circuit cases it relies upon, namely *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992):

> The weight of authority holds that a federal court may release not
> only those claims alleged in the complaint, but also a claim 'based

members. They instead attempt to stall the settlement by objecting that plaintiffs have not "establish[ed] the reasonableness of the proposed settlement with respect to" *the Banks*. PPB Opp. at 9.

"Reasonableness to non-settling parties" is not the applicable standard under Fed. R. Civ. P. 23. Before notice of a proposed settlement can be sent to a class, the court must determine that it "will likely be able to" both (1) "certify the class for purposes of the judgment on proposal" and (2) "approve the proposal under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B). The first requirement, likelihood of class certification, requires the plaintiffs to satisfy the four prerequisites of Rule 23(a) and show their claim fits within one of the three categories of Rule 23(b). *Walker v. Life Ins. Co.*, 953 F.3d 624, 630 (9th Cir. 2020). The second requirement, likely approval under Rule 23(e)(2), focuses on the fairness of the settlement to absent Class members. The Court evaluates preliminarily whether the proposed settlement "is fair, reasonable, and adequate," considering several factors listed in the Rule, such as whether the parties negotiated at arm's length and the terms of any agreement on fee awards. *See* Fed. R. Civ. P. 23(e)(2)(A)–(D).

Here, the Banks' sole concern is the future entry of a contribution claims bar order. By attacking class representatives' motion for preliminary approval, rather than waiting for a later motion for approval of a contribution claims bar order, the Banks have invited resolution of this issue now. The Class is not opposed to resolving it now so long as that means the Banks will be foreclosed from raising the same issue later and further delaying final approval of the settlement.

---

on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.'

**B.  This court has personal jurisdiction over the Banks and equitable power to enter a contribution bar order.**

The Banks first argue that approval of the settlement should be denied because the Court lacks personal jurisdiction over them to enter the contribution bar order. As with the same arguments they raised in their motions to dismiss, the Banks misconstrue the facts and misapply the law related to personal jurisdiction in an Oregon Securities Law case. The Banks again contend that they "had no direct connection to plaintiffs or the securities sales" and that they "merely provid[ed] loans to the managers of the Funds" so as to suggest their participation and aid in the security sales in Oregon to Oregon residents was too remote for personal jurisdiction to attach. PPB Opp. at 6, 15. That is factually incorrect, ignores the important role the Banks played in the securities violations, and, under the circumstances of this case, is no defense to liability or this Court's exercise of personal jurisdiction.

The Banks routinely funded the purchase of Oregon real estate contracts for American Equities, AEM Funds' manager, which American Equities then sold to AEM Funds (at undisclosed and unreasonably inflated values). That furnished AEM Funds with the assets necessary to lure investors into purchasing AEM securities. And that, in turn, resulted in millions of dollars of the Oregon investors' securities sale proceeds being used to pay off the Banks' loans, accrued interest, and fees over a period of 15 years. Pls.' Combined Opp. to Mots. to Dismiss of Defs. Pacific Premiere and Riverview at 13–26, ECF No. 85 ("Pls.' Combined Opp.") (discussing the Banks' repeated contacts with AEM Funds' Oregon assets). At the same time, the AEM Funds' offering documents and marketing materials falsely stated that the assets AEM used to lure investors were unencumbered and misleadingly omitted the existence of the Banks' loans, their security interest in AEM Funds' Oregon assets, or that investor proceeds would be used to pay the principal,

interest, and fees on those loans. The Banks' undisclosed participation and material aid unquestionably enabled the AEM securities sales to Oregon investors who were misled into believing their money would be used to purchase unencumbered real estate contracts. In this way, the Banks had a very real and direct connection to the Oregon securities sales and AEM Funds' Oregon assets that the Banks had encumbered.

But the Banks did more than help AEM Funds acquire the Oregon assets that were used to lure Oregon investors into purchasing AEM securities. In many cases, and without any disclosure to current or prospective AEM investors, the Banks loaned American Equities and its principal Ross Miles ("Miles") money for purposes entirely unrelated to AEM Funds while securing those loans with AEM Funds' Oregon assets. And in exchange for diminishing the value of AEM Funds' assets with the Banks' security interests, AEM Funds received nothing. The Banks' repayment position depended on their recorded security interests in Oregon assets. Had the Banks ever been forced to foreclose their security interests recorded in Oregon counties on AEM Funds' Oregon assets, the Banks would have turned to Oregon courts.[2] That they are now being sued in Oregon— due in part to the untrue statements and misleading omissions in offering materials about their interests in AEM Funds' Oregon property—should come as no surprise.

To the extent that by "no direct connection," the Banks mean that "[their] name [does not] appear[] on any of the investment documents," PPB Opp. at 6, that is very true and precisely the problem. The offering documents should have disclosed the Banks' loans, security interests in AEM Funds' assets in Oregon, and the fact that Banks' loans were being used to hide American Equities' insolvency, but they did not. Instead, AEM Funds' marketing material falsely represented

---

[2] Indeed, Pacific Premier has filed lawsuits in Tillamook Circuit Court against Ross Miles. Pls.' Combined Opp. at 42.

that the AEM Funds "purchase or lend first position real estate receivables for a group of investors," omitting that those assets were often encumbered by first position Bank security interests. SAC ¶ 30(c)(ii). The offering documents and marketing material also failed to disclose how, as a quid pro quo, Pacific Premier used AEM fund assets to unload distressed Oregon loans. The clearest example of that is a $600,000 distressed loan for a development in La Pine, Oregon owned by AEM's fund manager, American Equities. Despite the fact that the La Pine development did not have a connection to any of the AEM funds, Pacific Premier "loaned" American Equities the money to pay off the debt and secured that loan with AEM Fund assets in four different Oregon properties, siphoning the value of those properties from the equity of AEM investors. Pls.' Combined Opp. at 22; Decl. of John C. Rake in Supp. of Pls.' Combined Mots. to Dismiss of Defs. Pacific Premier and Riverview, Ex. 20, ECF No. 86 (examples of loan memos discussing Pacific Premier's Oregon security interests). As explained in the Class's Opposition to the Motion to Dismiss, these and many other contacts provided the necessary minimum contacts for this Court to exercise personal jurisdiction. Pls.' Combined Opp. at 26–48.

Ultimately, whether or not the Banks had a direct connection to investors is legally irrelevant. "We didn't deal directly with the purchasers" is an old song non-seller defendants often unsuccessfully sing in Oregon Securities Law cases. Participation and material aid, if important to an unlawful securities sale, can be attenuated and indirect. *See* Pls.' Combined Opp. at 68–70 (citing cases). For example, in *Adamson v. Lang*, the Oregon Supreme Court observed "[i]t is true that defendant [lender] did not directly make a sale of the Ore-Mont Oil Corporation securities. However, the evidence would support a verdict based upon his participation [loan to close escrow] in a scheme which was designed to make it possible for Lang to sell Ore-Mont Oil Corporation stock." 236 Or. 511, 515 (1964). Similar circumstances are true here as well. Just as in *Adamson*,

here the Banks made the loans that were designed to make it possible for American Equities to acquire the real property interests that American Equities packaged—i.e., turned into securities—and sold to investors, then used the proceeds to repay PPB and Riverview along with their (substantial) fees and interest.

Likewise, when American Equities' Ponzi-like scheme was at risk of collapsing because inflows of new investor money did not match outflows, the Banks came through again and provided the money to keep the scheme afloat—again "to make it possible" for AEM to keep selling securities in Oregon to Oregon citizens. A similar thing happened in the *Ainslie* cases, where two banks made offsetting loans so that investor money that had been segregated in an escrow account could be used "to prevent the Silver Valley foreclosure that would at the least have seriously impeded the [securities] offering." *Ainslie v. Spolyar*, 144 Or. App. 134, 145 (1996); *Ainslie v. First Interstate Bank*, 148 Or. App. 162, 170, 185 (1997). The court of appeals affirmed the trial court's directed verdict that First Interstate had participated and materially aided in the sales. 148 Or. App. at 186.

The Banks' objection to the DWT settlement further underscores why the exercise of jurisdiction is reasonable under the circumstances.[3] Under the Banks' narrow view of personal jurisdiction, even though this case involves Oregon citizens who were sold securities in Oregon of AEM Funds that predominantly held Oregon assets, any contribution actions the Banks would

---

[3] "Whether due process is satisfied must depend, rather, upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945). "Thus courts in appropriate case[s] may evaluate the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–77 (1985) (simplified).

pursue of any defendants over which this Court indisputably has jurisdiction (i.e, Miles, Wile, and DWT) would have to occur in Washington, not Oregon. That in turn would result in piecemeal litigation, rife with the potential for inconsistent decisions, and a chaotic resolution of Oregon security claims. It makes far more sense and is far more reasonable that all actions related to the harm Oregon citizens have endured as a result of the sale of Oregon securities should occur in Oregon. That is exactly why ORCP 4 J expressly extends personal jurisdiction to "[a]ny … nonresident … who has engaged in conduct prohibited or made actionable under the Oregon Securities Law."

### C. Any judgment against the non-settling defendants will be reduced dollar-for-dollar by any amounts the Class receives from the DWT settlement.

The Banks acknowledge that contribution bars are routinely granted as part of partial settlements of multi-party lawsuits, noting that in *Ciuffitelli v. Deloitte & Touche LLP*, "this Court approved the use of a pro tanto contribution claims bar as 'fair, reasonable, and adequate." PPB Opp. at 14 n.4 (citing 2019 WL 1441634, at *10 (D. Or. Mar. 19, 2019)). But the Banks erroneously contend that "here, unlike *Ciuffitelli*, the proposed Bar Order does not provide for *any* method of judgment credit for the non-settling defendants, and is therefore prejudicial on its face." PPB Opp. at 14 n.4. The Banks are mistaken.

Here, as in *Ciuffitelli,* the settlement contemplates that upon entry of a contribution claims bar and final approval of the settlement, claims against non-settling parties will be subject to a dollar-for-dollar reduction consistent with a pro tanto credit. The Motion explains that the settlement "results in a dollar-for-dollar reduction of the amount of claims a plaintiff or a Class member may have against [non-settling defendants]." Motion at 8–9. It is also clear from the proposed Class settlement notice attached to the Motion that requires each Class member to

acknowledge that "any payment or distribution made from the class action settlement fund to [a class member] shall reduce, on a dollar-for-dollar basis, the amount of [the Class member's] claims against any non-party to this settlement." Motion, Ex. A-2 at 8, ECF No. 89-3. And the proposed judgment dismissing DWT from this case provides that "the plaintiff or Class member shall reduce, on a dollar-for-dollar basis, his or her claim by the amount he or she receives pursuant to the plan of distribution made from the Settlement Fund." Motion, Ex. B ¶ 13, ECF No. 89-4. Accordingly, to the extent that the Banks' objection rests on the mistaken belief that the proposed bar order lacks a judgment credit for non-settling defendants, the objection is moot.[4]

### 1. Controlling state law provides that any amounts Class members receive will offset their claims against the Bank on a dollar-for-dollar basis.

The Banks are also mistaken about the controlling law for determining the type of judgment credit that is appropriate in connection with a contribution bar given for a partial settlement under the Oregon Securities law. The Banks, citing a single case under the *federal* securities law, contend that "a mere offset of the plaintiffs' total damages (also known as a pro tanto reduction) is insufficient because nonsettling defendants are forced to pay to plaintiffs the amount of the discount." PPB Opp. at 13 (citation omitted). The Banks instead argue that any judgment against them should be offset by the degree of fault of DWT. Under the Banks' view, "the jury is asked

---

[4] Although the draft bar order submitted with the Motion does not explicitly mention a judgment reduction credit, that could be remedied when the Class moves for entry of the bar order. At this phase, the Class is only seeking preliminary approval of the settlement and not entry of the draft bar order. "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION                Page 10
FOR PRELIMINARY APPROVAL OF PARTIAL SETTLEMENT

not only to determine the total damage amount, but also the percentage of culpability of each of the nonsettling defendants as well as the settling defendants." *Id.* (citation omitted).[5]

But federal law and the sole case the Banks rely on under the federal securities law do not apply to contribution bars under the Oregon Securities Law. Orders barring contribution claims arising under state law are governed by *state law*. *See Spear v. Fenkell*, 2014 WL 7745845, at *12, *19 (E.D. Pa. Dec. 12, 2014) (noting that "[a] federal court exercising supplemental jurisdiction over a state law claim applies the choice-of-law rules of the forum's state" and finding that "Pennsylvania's contribution scheme should apply to the state law claims in this case.").[6]

The Banks' pro rata approach for contribution bars finds no support in Oregon law. A fault-based reduction of liability to victims of securities violations is inconsistent with the terms of ORS 59.115(3), which imposes joint and several liability on a nonseller to "the same extent as the seller" irrespective of the relative fault of the nonseller. If "fault" were an important factor under Oregon Securities Law then the liability of the "seller"— typically the party most at fault for the unlawful securities sales—would not be joint and several with participants and material aiders who play a smaller role in the securities sales. Instead, "[t]he nonseller participant becomes liable under ORS 59.115(3) because it has 'participated or materially aided' in the sale, not because it has violated any law." *Anderson v. Carden*, 146 Or. App. 675, 683 (1997). In this way, the Oregon Securities

---

[5] Even if a pro rata settlement credit were proper (it is not), "the settlement credit function is for the court, not the jury." *Yardley v. Rucker Bros. Trucking, Inc.*, 42 Or. App. 239, 242 (1979).

[6] *See also Morin v. Trupin*, 1993 WL 248802, at *6 (S.D.N.Y. June 29, 1993) ("New York law governs the settlement of New York state law [contribution] claims."; *In re Atl. Fin. Mgmt. Inc. Sec. Litig.*, 718 F. Supp. 1012, 1015 (D. Mass. 1988) (applying Massachusetts law to "those claims which are based on state law" and utilizing a credit against the ultimate judgment in the amount of the settlement); *see also Nw. Airlines, Inc. v. Transp. Workers Union of Am.*, 451 U.S. 77, 97 n. 38 (1981) ("Of course, federal courts, including this Court, have recognized a right to contribution under state law in cases in which state law supplied the appropriate rule of decision.").

Law does not impose liability on nonsellers because of their conduct but rather "expands the class of potentially liable persons from whom damages may be obtained for a seller's violation of the securities laws." *Id.* A pro rata approach therefore would be contrary to the statute's liability structure and require a trial on the fault of both the settling and non-settling defendants, who are otherwise jointly and severally liable to defrauded investors regardless of fault. The Oregon Supreme Court has recognized that although liability without regard to fault imposes "a substantial burden" on nonseller participants, "this legislative choice was deliberate." *Prince v. Brydon*, 307 Or. 146, 150 (1988).

By contrast, a pro tanto reduction is consistent with the non-fault-based liability imposed under the statute as well as the well-established rule that the Oregon Securities Law is to be "liberally construed to afford the greatest possible protection to the public." *Adams v. Am. W. Sec., Inc.*, 265 Or. 514, 524 (1973) (quoting *Adamson*, 236 Or. at 516). To that end, in *Ciuffitelli* Judge Acosta found a "pro tanto judgment reduction provides the greatest likelihood [of] recovery for Plaintiffs" and is, therefore, consistent with the purpose of ORS 59.115 to "afford the greatest possible protection to the public." *Ciuffitelli,* 2019 WL 1441634, at *10. Other Oregon cases have similarly concluded that a pro tanto approach is the most consistent with the structure of the statute and the policies it is intended to implement. *See Ainslie v. Spolyar*, 144 Or. App. at 147–48 (affirming trial court's pro tanto contribution bar and rejecting defendant's appeal that it should have been based on proportionate fault); *SEC v. Capital Consultants*, 2002 WL 31470399, at *3 (D. Or. Mar. 8, 2002) (approving a pro tanto claims bar); Order Approving Compromise, *Adams v. Perkins & Co. P.C.*, No. 1110-12903 (Mult. Co. Cir. Ct. Nov. 24, 2014)  (attached as Ex. A); Claims Bar Order and Injunction, *Gattuccio v. Averill*, Consolidated Cases No. 1011-16582 and 1105-06352 (Mult. Co. Cir. Ct. Aug. 16, 2013) (attached as Ex. B) (approving pro tanto bar order).

Indeed, the Banks do not cite a single case under the Oregon Securities Law applying a pro rata contribution claims bar or assessing the "fault" of any party relative to securities violations.

In reaching these decisions, Oregon courts recognize that the need to compensate investors for their losses outweighs the interests of defendants in limiting their liability to an approximation of their fault. In *Capital Consultants*, Judge King explained he was approving a dollar-for-dollar pro tanto judgment credit and rejecting a fault-based judgment credit for a settlement with Barclay Grayson, the primary culprit in the securities violations, even if it meant the nonsettling defendants would be adversely affected:

> I conclude that my paramount responsibility is to look after the best interests of the receivership estate and creditors even if my decisions potentially affect certain defendants adversely. Consistent with this approach, I would be remiss to not approve a settlement with a key defendant (even if it is conditioned on a pro tanto allocation of liability) if the settlement allows the estate to receive far more than it would if it litigated against the defendant to judgment. Likewise, for me to insist on a proportionate allocation of liability in this instance would severely handicap the ability of Claimants to recover a significant percentage of their losses, given that Barclay Grayson's inability to pay anywhere close to the monetary value of his liability (which presumably exceeds all but Jeffrey Grayson's liability) would, arguably, reduce the exposure of non-settling defendants to such a point that they would receive a windfall.

2002 WL 31470399, at *3.

Moreover, when the Oregon Securities Law was amended in 1967 to include the relevant contribution provisions, there was no concept of proportionate fault claims reduction in Oregon. In 1967, pro tanto was the reduction method for a plaintiff's claims against joint tortfeasors under Oregon law. As the Oregon Supreme Court held in *Kirby v. Snow*, 252 Or. 592, 595 (1969):

> It is now settled law in this jurisdiction that, where, as here, a plaintiff's injuries are the result of the concurrent negligence of two or more tort-feasors, payment by one or more of the tort-feasors to the injured party, which does not discharge the remaining tort-

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION                    Page 13
FOR PRELIMINARY APPROVAL OF PARTIAL SETTLEMENT

> feasors, operates to reduce pro tanto the amount he is entitled to
> recover from any other tort-feasor.

This is grounded in the one satisfaction rule that prevents a plaintiff from recovering more than total actual loss. *Starr v. Heckathorne,* 270 Or. 238, 240–41 (1974). The one satisfaction rule has been applied in Oregon Securities Law cases. *Ainslie v. Spolyar,* 144 Or. App. at 147 ("Defendant argues ... that plaintiffs are entitled to only one satisfaction for each injury. That rule is not in dispute …"); *accord Singer v. Olympia Brewing Co.,* 878 F.2d 596 (2d Cir. 1989) (applying one satisfaction rule, settling plaintiff required to reduce federal securities claim pro tanto (dollar-for-dollar) by settlement received from other defendant). And it is the one satisfaction rule and the dollar-for-dollar offset for any amounts received in settlement that the Oregon legislature had in mind when it created the right of contribution under the Oregon Securities Law.

Later, when the Oregon Legislature adopted proportionate fault rules, it limited their applicability to personal injury and property damage claims, where the idea of assessing each defendants' degree of fault for the harm caused by that defendant's conduct or the plaintiff's contribution to the harm made sense. See, e.g., ORS 31.800, et seq. It could have but did not expand those provisions to include the securities law. And that makes sense because the liability of nonsellers is derived from the securities violations of the seller who often times lacks the ability to pay any judgment. If the Banks are correct in their reasoning, at trial the finder of fact will weigh the Banks' degree of fault not just against DWT, but also Miles, who orchestrated the scheme and joint and several liability will virtually disappear

Even if Oregon law was not controlling, the reasoning underlying the only case the Banks cite to support a pro rata contribution bar, *Franklin v. Kaypro Corp.,* 884 F.2d 1222 (9th Cir. 1989), does not apply to Oregon Securities Law. A more recent Ninth Circuit case makes that clear. In

*Ameripride Services Inc. v. Texas Eastern Overseas Inc.*, 782 F.3d 474 (9th Cir. 2015), the court

limited *Franklin*'s application to contribution bars arising under the federal Securities Act of 1933

("Securities Act"). *Ameripride* involved a contribution bar for a partial settlement of environmental

remediation costs under CERCLA. Noting that CERCLA, like the Securities Act, did not provide

for a specific methodology for a judgment credit in an action between private parties, the Ninth

Circuit instead looked to the purpose and intent of the statute to determine which method was

appropriate. *Id*. at 485–86. The court explained that the pro rata rule in *Franklin* was premised on

the federal securities laws' policy goals, which differed from CERCLA's. *Franklin* focused on

"the statutory goal of punishing each wrongdoer" in justifying a pro rata approach that would limit

a wrongdoer's liability to their degree of fault. *Id*. at 487. CERCLA, by contrast, is focused on

"protecting the public health and environment by facilitating the expeditious and efficient cleanup

of hazardous waste sites" with a secondary purpose of "assuring that 'responsible' persons pay for

the cleanups." *Id.* (simplified). And because a "proportionate share approach does not promote

early settlement to the same extent as the . . . pro tanto approach, it may not be the best approach

for furthering the goals of CERCLA in all cases." *Id.* In other words, the rule in *Franklin* is limited

to the specific policy goals of the federal securities laws.

### 2. A pro tanto contribution bar is consistent with the purpose and intent of the Oregon Securities Law to compensate victims of unlawful securities sales.

A pro tanto approach furthers the goals of the Oregon Securities Law which, like CERCLA,

differ from the federal securities laws' intended purpose of "punishing wrongdoers" that resulted

in a pro rata approach in *Franklin*. The primary objective of the Oregon Securities Law is to ensure

that victims of securities violations are adequately compensated for their losses. To accomplish

that goal, the Oregon Securities Law "is to be liberally construed to afford the greatest possible

protection to the public." *Adams,* 265 Or. at 524 (simplified). "The primary purpose of the Blue Sky Law is to protect investors." *Sperry* & *Hutchinson Co. v. Hudson et al.,* 190 Or. 458, 467 (1951).

The Oregon Securities Law has a number of provisions designed to protect investors and maximize recoveries for victims of securities violations that are absent from the federal securities laws. The Oregon Securities Law (but not the federal securities laws) imposes joint and several liability on "every person who participates or materially aids" sales of securities made by means of untrue statements or material omissions. ORS 59.115(3).

Liability of participants and material aiders is broader under the Oregon Securities Law than it is for sellers of fraudulent securities under the federal securities laws. The federal securities laws requires a plaintiff to plead and prove "scienter," *i.e.,* that "defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (simplified). Under the Oregon Securities Law, investors are not required to prove the state of mind of participants and material aiders. Instead, non-sellers have an affirmative defense to liability if they can prove that they "did not know, and, in the exercise of reasonable care, could not have known, of the existence of facts on which the liability is based." ORS 59.115(3). And, in contrast to the federal securities laws, the Oregon Securities Law imposes liability without regard to whether the buyer relies on the omission or misrepresentation that is the basis for the securities violation. *Everts v. Holtmann*, 64 Or. App. 145, 152 (1983); *contra Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008) ("[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of [a federal securities law] private cause of action.").

A pro rata method would undermine the Oregon Securities Law's goal of ensuring that investor victims of securities law violations are fully compensated for their losses, and it would discourage early settlements. A pro rata approach would expose a victim of securities violations to the risk of less than a full recovery if a settled party, represented by an empty chair at trial, is deemed to be at fault for more than they paid in settlement. It would also mean that one of the principal objectives of a settling defendant—to buy peace—would not be realized. They would be subject to further litigation and would be an important player in allocating fault at trial. That dynamic would make achieving settlements much more difficult. And requiring a trial about "fault" that otherwise does not exist in an Oregon Securities Law case would complicate and prolong trial with contested fact issues multiplied instead of reduced. As one court has noted, "the [pro rata method] is a vehicle which can be used to tactically delay and increase costs under the guise of seeking 'equity.'" *Atl. Richfield Co. v. Am. Airlines, Inc.*, 836 F. Supp. 763, 777 (N.D. Okla. 1993) (applying a pro tanto contribution bar order in a CERCLA case). By contrast, "the pro tanto contribution bar rule encourages settlement, provides for certainty in computing contribution credits, and streamlines the trial task." *Id.* at 776.

Notably, in the more than 50 years since the right of contribution has existed for participants and material aiders under the Oregon Securities Law, plaintiffs have not found a single reported case of anyone ever using it to bring a claim for contribution. Thus, the important policy implications of ensuring full compensation to victims of securities violations, streamlining litigation, and encouraging settlement should far outweigh the need to protect a remedy that does not appear to have been used in the 50 years it has existed. For these reasons, the pro tanto contribution bar should be used for the DWT settlement.

### 3. The DWT settlement amount is fair under the circumstances.

Under a pro tanto approach, "the settling defendant is protected against contribution actions only if it shows that the settlement is a fair forecast of its equitable share of the judgment." *Ameripride*, 782 F.3d at 484 (quoting *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 213 (1994)). Here, the DWT settlement more than adequately meets that standard, well exceeding typical security class action settlements. DWT's settlement represents 15% of the Class's total claim (including interest) and 42% of their out-of-pocket losses of investment principal. Motion at 16, SAC ¶ 5. Surveys of class action settlements in securities cases regularly fall between 3.4% and 14% of claimed damages. *Katz v. China Century Dragon Media, Inc.*, 2013 WL 11237202, at *5 (C.D. Cal. Oct. 10, 2013) (citing Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements, 2010 Review and Analysis*, at 5); *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 245 (D.N.J. 2000) (citing a survey of 377 securities class action settlements that "revealed that the average settlement comprises between 9% and 14% of plaintiffs' claimed damages"); *see also In re Prudential Securities, Inc. L.P. Litig.*, 1995 WL 798907 (S.D.N.Y. 1995) (approving settlement of between 1.6% and 5% of claimed damages); *In re Crazy Eddie Securities Litig.*, 824 F. Supp. 320, 323 (E.D.N.Y. 1993) (approving settlement with multiple defendants amounting to approximately 6% of investors' damages in securities class action). The proposed settlement with DWT is a fair representation of the litigation risks and costs of proceeding to trial, which would further delay a significant recovery for the Class.

### 4. A pro tanto contribution bar is fair under the circumstances of this case.

The premise of the Banks' objection to the settlement and plea for a pro rata bar order is that DWT is substantially more at "fault" and, in a contribution action, would be required to pay a sum greater than the $4.5 million it is willing to pay in this settlement. The Banks' argument that

DWT's role in drafting the offering documents merits a more significant percentage of "fault" than 42% of the out-of-pocket losses rests on a misunderstanding of the nature and extent of the Banks' liability. They incorrectly claim that Plaintiffs believe them to be "liable merely because [they] loaned money to the managers of the investment funds, not the funds themselves, without any direct role in the securities sales." PPB Opp. at 3. That assertion significantly misstates the Banks' own critical role in the AEM security sales and the Banks' knowledge of the inner workings of AEM, and simultaneously ignores the important role banks have historically played in these types of Ponzi-like schemes that have led to significant liability under the Oregon Securities Law.

> ### a.  Banks play a critical role in sustaining Ponzi-like schemes and prolonging the unlawful sales of securities.

To perpetrate small frauds, confidence men can act on their own. But to perpetrate big multi-million-dollar frauds like AEM, they need the aid of banks willing to look the other way. Banks provide ready, liquid capital to maintain Ponzi-like schemes during the inevitable lean times—when the amounts paid out to old investors exceed incoming funds from new investors. That is why law enforcement authorities have described banks as gatekeepers, having unique visibility into the financial operations of Ponzi-like schemes and the power and responsibility of detecting and reporting securities violations. And Congress has given banks both the tools and the responsibility to search for and report suspicious activity.

There is no better example of the important role banks play than Bernie Madoff's Ponzi scheme. Madoff's bank, JP Morgan, like the American Equities' Banks here, supplied the scheme with needed infusions of capital at a time when it was on the verge of collapsing. *See* FBI Press Release Announcing Criminal Charges and Deferred Prosecution Against J.P. Morgan, https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-and-fbi-assistant-director-charge-

announce-filing-criminal. In announcing why Madoff's banker was required to pay $1.7 billion to

the victims of Madoff's fraud, the FBI explained:

> J.P. Morgan failed to carry out its legal obligations while Bernard
> Madoff built his massive house of cards. … But it took until after
> the arrest of Madoff, one of the worst crooks this office has ever
> seen, for J.P. Morgan to alert authorities to what the world already
> knew. … The FBI can't do it alone. Traders, compliance officers,
> analysts, bankers and executives are the gatekeepers of the financial
> industry. We need their help protecting our markets.

*Id.*

Oregon courts too have found that banks often play an important role in materially aiding

securities law violations. *Adamson*, 236 Or. at 515–16 (lender who provided funds needed for a

securities offering participated and aided in the offering)*; Ainslie v. First Interstate Bank,* 148 Or.

App. at 185 (escrow bank that enabled sales of securities by releasing funds to the issuer

participated and materially aided all security sales); *White v. ITC Corp.,* 1986 WL 15447 (D. Or.

1986) (savings & loan participated and materially aided securities offering when it advanced funds

for an offering that it had a financial interest in)*;* Order on Defs.' Mots. to Dismiss or Make More

Definite and Certain, *Cox v. Holcomb Family LP*, No. 1308-12201 (Mult. Co. Cir. Ct. Dec. 15,

2015) (denying banks motion to dismiss securities claims and finding their alleged role important

and material to sustaining the unlawful securities sales); Op. and Order Re: Mots. to Dismiss,

*Pommier et al. v. Deloitte & Touche et al.*, No. 16CV36439 (Mult. Co. Cir. Ct. Feb. 22, 2018)

(attached as Ex. D) (TD Ameritrade aided securities offering when it referred clients to investment

advisors who sold security which provided the Ponzi-like scheme the capital it needed to appear

successful).

In *Holcomb Family,* for example, Judge You found Umpqua Bank's role in a Ponzi-like

scheme to be important, citing the same type of facts that are present in this case. Umpqua

repeatedly loaned money to Berjac's securities business that was then used to pay investors redeeming their securities interests. *Holcomb Family* at 6. Those loans, like the Banks' loans to American Equities in this case, gave the investment an "illusion of credibility" and the false appearance of "a track record that Berjac was able to keep and perform its obligations, that investments in Berjac were safe and secure, and that Berjac was solvent." *Id.* at 7. Judge You found that material aid "go[es] beyond tasks such as mere preparation and execution of documents" and that "the [unlawful securities] sales could not have been completed or consummated without the loans from Umpqua." *Id.* at 8. Ultimately, Umpqua and one other bank with similar involvement agreed to pay $16 million to the victims of Berjac's unlawful securities sales. *See* https://www.oregonlive.com/business/2017/01/oregon_banks_to_pay_16_million.html

Juries too have found that the activities of banks in connection to securities violations merits significant liability. In *Ainslie v. First Interstate Bank,* for example, plaintiffs also asserted an Oregon RICO claim against First Interstate for substantially the same conduct as the securities claim. The jury not only found the bank liable on the securities claim but also awarded plaintiffs $5 million in punitive damages on the Oregon RICO claim. 148 Or. App. at 173–74. Though the appellate court reversed the Oregon RICO judgment and punitive damages award, the jury verdict illustrates how the Banks' wishful thinking that "it is plausible that a jury could find Pacific Premier only 1% liable" is out of touch with reality. PPB Opp. at 15.

### b. The Banks played a crucial role in the sales of AEM securities well beyond the mere preparation and execution of documents.

Here, the Banks enabled American Equities to "fraudulently create[] an illusion of prosperity and false expectations" regarding AEM investments. *Blackie v. Barrack*, 524 F.2d 891, 903 n. 19 (9th Cir. 1975); SAC ¶¶ 31, 43, 61, 65 (describing how AEM securities were sold in

connection with untrue and misleading statements establishing illusions of prosperity and false expectations); ¶¶ 14–17, 42–43 (describing Riverview participation and material aid); ¶¶ 18–19, 44–65 (describing PPB participation and material aid).

The Banks and American Equities had a symbiotic relationship dependent on the AEM securities sold to investors in violation of the Oregon Securities Law. Beginning in 2003, financial statements American Equities provided Riverview revealed that it was insolvent with liabilities exceeding its assets. SAC ¶ 14.[7] Despite American Equities' insolvency, Riverview provided what became a $4 million line of credit to American Equities that enabled it to operate and sell securities. *Id.* American Equities used the money on the line of credit to purchase real estate contracts (subject to Riverview's security interest) that it would package into pools and sell to investors, falsely claiming that the investment fund had unencumbered interests in the funds' assets and failing to disclose Riverview's security interests. In essence, on an ongoing basis, through its loans, Riverview provisioned American Equities with the product that American Equities then securitized and sold to investors. American Equities would then use the investor funds to pay some of the principal (which continued to grow) and the interest on the Riverview line of credit. *Id.* From September 28, 2007 to April 18, 2008, Riverview received $7,369,000 in payments on American Equities line of credit directly from the AEM funds. *Id.* ¶ 16. Riverview's relationship with American Equities was very profitable for Riverview, producing a return on the bank's equity (ROE) of close to 36%. *Id.* ¶ 42.

---

[7] The SAC specifically cites Riverview's Credit Memoranda in support of each of the quotes, namely Nov. 10, 2004; Feb. 17, 2006; Oct. 5, 2007; Oct. 3, 2008; Sep. 15, 2009; and May 24, 2010.

Riverview continued to lend money to American Equities (and separately to Miles personally) through the Great Recession, the collapse of the real estate market, and during American Equities' perennial insolvency. *Id.* ¶ 18. In fact, in 2012, Riverview expressly allowed American Equities to defer loan payments, counting on AEI to "refinance" the loan with "investor funds by year end." *Id.* ¶ 42 (citing Credit Memorandum, Oct. 23, 2012). In a very real way, Riverview was "participating" in the proceeds from the sale of securities that it materially aided with its line of credit. And because Riverview also held the deposit accounts of the funds through which investors' money flowed, Riverview had a unique view into American Equities' finances and operation of the funds that AEM's investors never had.

Like Riverview, Pacific Premier also played a pivotal and material role in the sales of AEM securities. From June of 2008 through December of 2018, Pacific Premier received American Equities financial statements revealing its insolvency at the same time it continued to provide American Equities and Miles multiple loans and lines of credit often secured with AEM fund assets. SAC ¶¶ 19, 51–53. Pacific Premier's loan memos acknowledged that its loans were being "paid off by investor funds" that were generated through sales of AEM securities. *Id.* ¶ 19. Though the loans were secured with assets of the AEM funds (*i.e.*, investor assets) and often paid off with investor funds, American Equities freely used the loan proceeds for its wider operational costs, transferring the money to Miles and among affiliates. *Id.* ¶¶ 51–52. And, like Riverview, Pacific Premier had a unique view into American Equities finances and operations that should have alerted Pacific Premier to the ongoing securities violations.

The material aid of the Banks enabled American Equities to create an "illusion of credibility" and the false appearance that American Equities was able to keep and perform its obligations, that investments in AEM funds were safe and secure, and that American Equities and

its funds were solvent. But for the loan proceeds, American Equities and its affiliates could not have continued to operate and security sales would have come to a screeching halt. And while the insolvent American Equities and its related funds continued to sell securities, the Banks continued to profit from the substantial interest and fees they received for over 15 years.

But interest and fees were not the only way Pacific Premier significantly benefitted from its relationship with American Equities and the AEM funds. Pacific Premier also used AEM funds to rid itself of bad debt. As just one example, in December 2009, Miles "purchased" a loan of a bankrupt debtor from Pacific Premier at its full, undiscounted, face value. SAC ¶¶ 61–63. The purchase was in part financed with Pacific Premier's $1.025 million loan to Miles personally but secured by AEM fund assets. *Id.*. The AEM funds received no consideration for the loan despite the fact that fund assets were used to collateralize it and, as it later turned out, to pay down the loan. *Id.*

It is these facts as well as many more alleged in the SAC that illustrate that the Banks did far more than "merely providing loans to the managers of the Funds" as they suggest. The Banks' role in the AEM security sales provides a stark contrast to DWT's role in preparing the offering documents. If fault were an issue in an Oregon Securities Law case (it is not), the Banks are awash in it. Bank participation and material aid in *Ainslie* led a jury to award $5 million in punitive damages against First Interstate Bank, and bank facilitation of the Madoff Ponzi scheme led the Department of Justice to fine JP Morgan $1.7 billion for its role.

### III. CONCLUSION

The $4.5 million DWT settlement represents a significant recovery for the Class, many members of which invested in AEM to provide fixed income in retirement. The Banks' objection to the settlement and premature opposition to the claims bar order is not a basis for denial of the

Class's Motion. The pro tanto credit is consistent with the policies of the Oregon Securities Law: it ensures that victims of securities violations are fully compensated for their losses, encourages settlements and efficient use of judicial resources, and streamlines trial by appropriately excluding issues of fault. For these reasons, the Court should grant the Class's Motion for Preliminary Approval of Partial Settlement.

Dated: December 1, 2022

LARKINS VACURA KAYSER LLP

s/ Christopher J. Kayser
Christopher J. Kayser, OSB #984244
John C. Rake, OSB #105808


ESLER STEPHENS & BUCKLEY, LLP

s/ John W. Stephens
John W. Stephens, OSB #773583
Michael J. Esler, OSB #710560

Attorneys for Plaintiffs